L. Maxcy, Inc., v. Nathan Mayo, as Commissioner of
Agriculture

196 So. 176
En Banc
Opinion Filed May 7, 1940

*Perry E. Murray,* for Appellant.

*George Couper Gibbs,* Attorney General, *H. E. Carter,*
and *Tyrus A. Norwood,* Assistant Attorneys General and
*Zewadski & Pierce* and *Doyle E. Carlton,* for Appellee.

Per Curiam.—A careful examination of the record in
this case fails to reveal any reversible error, therefore, the
final order entered by the chancellor is—

Affirmed.

Terrell, C. J., Whitfield, Chapman and Thomas,
J. J., concur.

Brown and Buford, J. J., dissent.

Buford J. (dissenting).—This case is before us to review
an order dismissing bill of complaint the purpose of which
was to procure a decree enjoining the Commissioner of Ag-
riculture of the State of Florida from destroying certain cit-
rus fruit, to-wit: 101 boxes of tangerines, which had been
seized by the Commissioner because of the alleged content
of arsenic, and to enjoin the Commissioner of Agriculture

from seizing and destroying other fruit which the Commissioner of Agriculture had threatened to seize and destroy.

The pertinent allegations of the bill are:

"2. That for several years continuously prior to August 1, 1938, plaintiff cared for and cultivated said grove and that plaintiff has continuously cared for and cultivated said grove since August 1, 1938, and that no arsenic nor any of its derivatives nor any combination, compound or preparation containing arsenic has been used as a fertilizer or spray on any of said tangerine trees since before August 1, 1937, and that said tangerines now on said trees when tested for maturity in the manner provided for testing tangerines by Chapter 17779, Laws of Florida, Acts of 1937, and also when tested for maturity in the manner provided for testing grapefruit and oranges by Chapter 10103, Laws of Florida, Acts of 1925, do not show, and when picked and prepared for shipment as plaintiff desires, will not show, an abnormal or excessively high ratio, but on the contrary do and will show a normal ratio, of total soluble solids of the juice thereof to the anhydrous citric acid thereof and that said maturity tests do not and will not indicate the presence therein and that said tangerines have a normal flavor and are of excellent quality in every respect.

3. That on or about the 7th day of January, 1939, plaintiff caused to be picked from said grove and removed to its packing house in Frostproof, Polk County, Florida, approximately 101 standard field boxes of said tangerines and that said tangerines so picked and moved to said packing house when tested for maturity in the manner provided for testing tangerines by Chapter 17779, Laws of Florida, Acts of 1937, and also when tested for maturity in the manner provided for testing grapefruit and oranges by Chapter 10103, Laws of Florida, Acts of 1925, did not show an abnormal or ex-

cessively high ratio, but on the contrary did show a normal ratio, of the total soluble solids of the juice thereof to the anhydrous citric acid thereof and that said maturity tests did not indicate the presence of arsenic therein and that said tangerines so picked and removed to said packing house were of normal flavor and of excellent quality in every respect, but that, despite said facts, certain citrus fruit inspectors employed by and under the control of the defendant, as Commissioner of Agriculture of the State of Florida, did seize said 101 boxes of tangerines at plaintiff's said packing house in Frostproof, Polk County, Florida, on the claim that the same contained arsenic and did take samples therefrom and that thereafter certain other citrus fruit inspectors employed by and under the control of the defendant, as Commissioner of Agriculture of the State of Florida, did cause said tangerines to be destroyed in Polk County, Florida, although Section 4 of Chapter 11844, Laws of Florida, Acts of 1927, as amended by Section 4 of Chapter 14485, Laws of Florida, Acts of 1929, extraordinary session, authorizes a citrus fruit inspector to seize citrus fruit only when the same is tested under the provisions of Chapter 10103, Laws of Florida, Acts of 1925, and shows an abnormal and excessively high ratio of total soluble solids of the juice thereof to the anhydrous citric acid thereof, indicating the presence of arsenic therein and although said Chapter 10103, Laws of Florida, Acts of 1925, makes no provision for testing tangerines for maturity or for any other purpose and although there is no provision of law than said Section 4 of Chapter 11844 as amended by said Section 4 of said Chapter 14485 for seizing citrus fruit suspected of containing arsenic.

4. That plaintiff desires and expects to pack and prepare said tangerines remaining on the trees in said grove for shipment at its packing house in Frostproof, Polk County, Flor-

ida, but that said citrus fruit inspectors and other citrus fruit inspectors employed by and under the control of the defendant, as Commissioner of Agriculture of the State of Florida, are threatening and have threatened to seize in Polk County, Florida, all of said tangerines now in the grove above mentioned as and when plaintiff shall cause the same to be picked and removed to its said packing house in Frost-proof, Polk County, Florida, regardless of whether or not said tangerines when tested in the manner provided by law show an abnormal and excessively high ratio of the total soluble solids of the juice thereof to anhydrous citrus acid thereof and thereafter to take samples of such tangerines and cause chemical analyses thereof to be made and if such analyses show the presence of arsenic in such tangerines above the tolerance permitted by the regulations established by the defendant as said Commissioner of Agriculture to cause said tangerines to be destroyed.

5. That as above alleged said tangerines are of normal flavor and of excellent quality in every respect and that plaintiff will suffer irreparable loss and damage if it is not permitted to pick said fruit and haul the same to its said packing house and prepare the same for shipment and ship and market the same and that if the defendant as Commissioner of Agriculture of the State of Florida, his agents, servants and employees, including all citrus fruit inspectors employed by him and under his control, are not restrained and enjoined from carrying out said threats to seize and destroy plaintiffs said tangerines as above set forth, plaintiff will be deprived of his property in said tangerines without any authority of law and without due process of law; that said tangerines are fully matured and will deteriorate and become worthless unless the same are picked, packed, shipped and marketed without further delay; that plaintiff has no plain, adequate and complete remedy at law."

In short, the bill which was filed on the 26th day of January, 1939, alleges (1) that the complainant became the owner of the grove from which the citrus fruit was gathered on August 1, 1938, and had since that time been the owner of that grove; (2) that no arsenic or any of its derivatives, or any combination, compound or preparation containing arsenic had been used as a fertilizer or spray on any of the trees from which the fruit was gathered since before August 1, 1937; (3) that when the fruit involved was tested for maturity in the manner provided for such testing by Chapter 17779, Acts of 1937, and when tested for maturity in the manner provided for testing grapefruit and oranges by Chapter 10103, Acts of 1925, it did not show and when picked and prepared for shipment will not show abnormally or excessively high ratio, but on the contrary will show a normal ratio of total soluble solids of the juice thereof to the anhydrous citric acid thereof and that said maturity tests do not and will not indicate the presence of arsenic therein; (4) that said tangerines have a normal flavor and are of excellent quality in every respect.

So, the question presented for us to determine is whether or not the allegations of the bill are sufficient to show, if true, and they are admitted to be true by motion to dismiss, that the factual conditions are such that the Commissioner of Agriculture is without authority of law to seize and destroy the fruit.

It is contended here that the bill of complaint should have been dismissed in the court below and that the order should be affirmed because the complainant in the court below did not come into a court of equity with clean hands. The contention is based upon the hypothesis that the bill of complaint does not allege that the tests made by the Commissioner of Agriculture will not show arsenic content exceeding .00028 of a grain of arsenic to the pound of fruit tested,

the same being the point of tolerance test fixed by the Commissioner of Agriculture to determine whether or not arsenic has been artificially applied to citrus fruit. That as this is not alleged and as the bill of complaint does not allege that the fruit contained no arsenic, the allegations are insufficient to show that the complainant is not violating, or has not violated Section 2 of Chapter 11844, Acts of 1927.

We do not think it was the legislative intent by the provisions of Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, and especially of Section 2, *supra,* to prohibit the sale, transportation or shipment for sale of citrus fruit which contained only that paucity of arsenic which might be contained therein by the action of natural processes and natural production. But that the statutes, *supra,* have application only to fruit which contains arsenic because of the application of arsenic or its derivatives in some manner as by fertilizing or spraying.

The legislative Act was designed to protect the citrus industry of Florida by prohibiting the *use* of arsenic, the *use* of which had been found to be deleterious to the industry. The statutes were never intended as a measure for the protection of public health but for the general welfare of one of the major industries of the State.

The bill of complaint here shows that no arsenic has been applied to the trees upon which this fruit was grown in any manner since August of the year before the crop of fruit here involved began to grow upon the trees, if any was ever applied.

Chapter 14485, *supra,* appears to be evidence of the recognition by the Legislature that citrus fruit would not be affected by arsenic applied more than a year before the setting of the particular crop of fruit. This is true because Section 2 of Chapter 11844, *supra,* was amended by the

latter Act to add to the language theretofore used in Section 2 the following:

"Provided it does not come from within a quarantined area or which has been within a quarantined area for one year previous to time of gathering fruit."

The same provision was added to amended Sections 3, 4 and 6 by the same Act.

This legislative action may also be taken as an indication that the purpose of the legislative Act was for the protection of the industry and, therefore, recognizing that it had been necessary to use arsenic in the effort to destroy the Mediterranean fruit fly the ban was lifted so that fruit affected by processes necessary at that time would not be included within the purview of the statute.

The doctrine that, "He who comes into a court of equity must come with clean hands" is well recognized and if the record here showed that the complainant in this case had put arsenic on the trees, either by fertilizing, or spraying, or otherwise, within a year before the gathering of the crop involved, we would apply the rule in this case. But the mere fact, if it be a fact, that the fruit may be shown to contain more than .00028 of a grain of arsenic per pound of tested fruit, we cannot say would be sufficieent to overcome the allegation of the bill verified under oath in which it is in effect alleged that no arsenic had been artificially applied to the fruit or to the trees within one year prior to the gathering of the crop.

Therefore, we hold that the contention that the complainant is shown to have unclean hands by the allegations of the bill is not tenable.

Chapter 11844, Acts of 1927, as amended by Chapter 14485, Acts of 1929, contains two penal clauses. Under one phase of the Act fruit containing arsenic may be seized, confiscated and destroyed; while under another phase of the

Act the person, firm or corporation who, or which may violate its provisions may be prosecuted criminally. We do not mean to say that the imposition of the penalty of seizure will preclude prosecution for violation of the Act. That question is not involved here.

It is also contended that the issues of this litigation have become moot and that the appeal should be dismissed because the fruit involved has long since been destroyed. It is true that the fruit has been destroyed, but the question here involved is of great public importance, and what is more important is that it involves the abrogation or the shifting of a long established constitutional guarantee against destruction of private property without due process of law. Therefore, as the question was not a moot question when the decree was entered, this Court will retain jurisdiction with the hope that it may definitely settle the issue involved.

It is a well settled rule that statutes authorizing seizure and confiscation of property must be strictly construed. See Hart v. State, 89 Fla. 202, 103 Sou. 633.

In The Texas Co. v. Amos, *et al.*, 77 Fla. 327, 81 Sou. 471, in construing the provisions of Chapter 6421, Laws of Florida, imposing a tax, this Court said:

"Not only does the bill specifically allege that complainant's business is that of an oil dealer, and that it owns tank cars only as a means of transporting oils, but other facts alleged show a necessity for such ownership in order to carry on the volume of business it conducts, and to assure a supply of oil products.

"The tank cars bring the owner no profit, but on the other hand, transportation of oil by means thereof costs more than to pay the regular freight rates charged by the railroads when using their own cars; they are not owned as a business, but as a means to the conduct of a business, that of selling

oils. No direct pecuniary income is received or expected from such ownership.

"While we think the legislative intent clear, if there is doubt it becomes our duty to resolve such doubt in favor of the citizen and against the State.

"The statute is penal in its nature and the rule is that penal statutes are to be construed strictly and are never to be extended by implication. Kloss v. Commonwealth, 103 Va. 864, 49 S. E. Rep. 655.

" 'No man,' said the Court in Harris v. Commonwealth, 81 Va. 240, 59 Am. Rep. 666, 'incurs a penalty unless the Act which subjects him to it is clearly within the spirit and the letter of the statute imposing the penalty.' "

Not only must a statute be strictly construed but its provisions must be strictly followed.

The authority of the commissioner to seize and destroy citrus fruit because of containing arsenic is found in Chapter 11844, Acts of 1927, Sections 3, 4, 5 and 6 of the Act are as follows:

"Sec. 3. The citrus fruit inspectors who shall be appointed by the Governor upon recommendation of the Commissioner of Agriculture, and the special citrus fruit inspectors who may from time to time be designated by the Commissioner of Agriculture, in accordance with Chapter 10103, Laws of Florida, Acts of 1925, shall be authorized to inspect citrus fruit hereunder at any packing house or other place where citrus fruit is being received or prepared for sale and transportation and to carry out the provisions of this Act in general under the direction and supervision of the Commissioner of Agriculture and subject to the provisions of law and the rules and regulations prescribed by the Commissioner of Agriculture.

"Sec. 4. Whenever any citrus fruit inspector or special

citrus fruit inspector shall find citrus fruit at any packing house or other place where the same is being received and prepared for sale or transportation which citrus fruit shall, when tested under the provisions of Chapter 10103, Laws of 1925, show an abnormal and excessively high ratio of total soluble solids of the juice thereof to the anhydrous citric acid thereof, indicating the presence of arsenic therein, it shall become the duty of said inspector to at once seize and take possession of said citrus fruit pending the procuring of the chemical analysis hereinafter provided for, notifying the manager or other person in charge of said packing house of such seizure. It shall be unlawful for the manager of said packing house, or the owner of said citrus fruit, or any person whomsoever to sell, transport or in any way move or dispose of any of said fruit from the time of seizure thereof until after the making of said chemical analysis and the receipt of the chemist's report thereon; provided, that no citrus fruit so seized may be held by any inspector more than 96 hours after the time of seizure thereof unless the same shall be shown by the chemist's analysis to contain arsenic.

"Sec. 5. Upon the making of seizure of any citrus fruit as provided for in Section 4 hereinabove, it shall be the duty of inspector making said seizure to immediately draw samples therefrom as shall be provided for by regulations to be issued by the Commissioner of Agriculture drawing said samples either from the packing house bins, or elsewhere in the packing house, or from field boxes or vehicles delivering said citrus fruit to said packing house. Such samples, so drawn by said inspector, shall be transported with all possible haste to such chemist or chemists as may be designated by the Commissioner of Agriculture for the making by such chemist or chemists of a chemical analysis thereof to determine whether or not the said citrus fruit

contains arsenic. It shall be the duty of said chemist or chemists to make said analysis with all proper haste and to report by the quickest means available the result of said ·analysis, as soon as the same is completed, to the inspector making the seizure. If the said analysis shall show that the said citrus fruit contains no arsenic it shall be the duty of the inspector to release the fruit from seizure as soon as he receives the report of the chemist or chemists thereon.

"Sec. 6. All citrus fruit prepared for sale or transportation or which is being prepared for such purposes or which has been or is being delivered for sale or transportation, that may be shown by chemical analysis hereinabove provided for to contain arsenic or any compound or derivative of arsenic shall be destroyed by the inspector making seizure of the same or by any citrus fruit inspector or by the sheriff of the county where found, as may be provided by regulations prescribed by the Commissioner of Agriculture."

Section 4 specifically provides:

"Whenever any citrus fruit inspector or special citrus fruit inspector shall find citrus fruit at any packing house or other place where the same is being received or prepared for sale or transportation which citrus fruit shall, when tested under the provisions of Chapter 10103, Laws of 1925, show an abnormal and excessively high ratio of total soluble solids of the juice thereof to the anhydrous citric acid thereof, indicating the presence of arsenic therein, it shall become the duty of said inspector to at once seize and take possession of said citrus fruit pending the procuring of the *chemical analysis hereinafter provided for."* * * *   (Emphasis supplied.)

Section 5 specifically provides:

"Upon the making of seizure of any citrus fruit as *provided for in Section 4 hereinabove,* it shall be the duty of the

inspector making said seizure *to immediately draw samples* therefrom as shall be provided for by regulations to be issued by the Commissioner of Agriculture, drawing said samples either from the packing house bins, or elsewhere in the packing house, or from field boxes or vehicles delivering said citrus fruit to said packing house. Such samples so drawn by said inspector shall be transported with all possible haste to such chemist or chemists as may be designated by the Commissioner of Agriculture for the making by such chemist or chemists of a chemical analysis thereof to determine whether or not the said citrus fruit contains arsenic. It shall be the duty of said chemist or chemists to make said analysis with all proper haste and to report by the quickest means available the result of said analysis as soon as the same is completed, to the inspector making the seizure." (Emphasis supplied.)

Section 6 specifically provides:

"All citrus fruit prepared for sale or transportation or which is being prepared for such purposes, or which has been or is being delivered for sale or transportation that may be shown by the *chemical analysis hereinabove provided for,"* etc. * * *

Sections 4 and 6, *supra,* were amended by Sections 4 and 5 of Chapter 14485, Acts of Extraordinary Session, 1929, but only by a proviso to the effect that the provisions of such sections should not apply to fruit within the area quarantined on account of the Mediterranean Fruit Fly.

In this legislative Act there is no provision authorizing the confiscation and destruction of any fruit because of arsenic content, except such as has been seized under the clear provisions of Section 4 of the Act, and under Section 4 of the Act the Legislature made its determination as to the conditions under which citrus fruit could be seized on

account of arsenic content. The provisions of the statute not only prescribe the conditions under which fruit may be seized for the reasons stated, but by the enactment of those provisions the Legislature precluded the seizure of fruit because of arsenic content under any other conditions than those specified in the Act.

The Legislature has determined, as appears from the language of the statute, that unless the arsenic content was sufficient to cause an abnormal or excessively high ratio of total soluble solids of the juice thereof to the anhydrous citric acid thereof, there would not be sufficient detrimental effect upon the fruit industry by reason of arsenic content to warrant its seizure and destruction.

In the statute the power to seize vested in the Commissioner of Agriculture was based upon the provisions of Chapter 10103, Acts of 1925, and limited the power of seizure to that fruit coming within the purview of the provisions of the 1925 Act in this regard.

This must be true because the Legislature definitely provided in the four sections above quoted for each and every step to be taken in the inspection, examination and tests to be made to culminate in seizure and confiscation. The procedure prescribed by the Legislature for the seizure and confiscation of property must be strictly adhered to and followed. When the Legislature has provided the procedure by which property may be seized and confiscated the Legislature, and the Legislature only, may change the requirements. If the legislative requirements are not complied with in the seizure and confiscation by administrative officers, then one is deprived of his property without due process of law. The contention that such construction if placed upon the Act will destroy its intended efficacy is not one to be heard by the judiciary, nor should it impel any administrative department to substitute its judgment for

that of the Legislature. If the legislative authority in this regard has been too narrowly circumscribed, it is within the legislative power to broaden the authority, staying only within the bounds fixed by the Constitution. The administrative officers are bound to take the law as the Legislature has enacted it and the courts may neither take from nor add to the provisions of legislative enactments, except when required to do so because the enactment fails to meet the standard fixed by the Constitution.

Under our Constitution the law-making power is vested exclusively in the Legislature. This legislative power may be exercised by delegation only when and where the Constitution expressly authorizes such delegation. The contention that the Commissioner of Agriculture is authorized to make and promulgate such rules and regulations as may be necessary to effect the *purposes* of the Act cannot be held a sufficient basis to constitute power in the Commissioner of Agriculture to *amend* the legislative Act or to *extend the limitations* of the legislative Act. One of the purposes of the Act was to authorize under certain conditions the confiscation of citrus fruit and, to carry out that purpose under those conditions, the Commissioner of Agriculture is authorized to make rules and regulations, provided same are not in conflict with the provisions of the Act.

The rules will not be held effective to vest power in the Commissioner of Agriculture which the legislative Act did not confer.

The leading case in Florida on delegation of powers is the case of State v. Atlantic Coast Line Railway Co., 56 Fla. 617, 47 Sou. 969, 32 L. R. A. (N. S.) 639, decided in 1908. In this case Mr. Justice WHITFIELD, speaking for the Court, said:

"The Legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an

unrestricted discretion in applying a law; but it may enact a law, complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose."

This has been the controlling case in all situations dealing with delegation of *power* to administrative bodies and has never been modified or overruled. See also State v. Duval County, 76 Fla. 180, 79 Sou. 692; Bailey v. Van Pelt, 78 Fla. 337, 82 Sou. 789; Whitaker v. Parsons, 80 Fla. 352, 86 Sou. 247; *Ex Parte* Lewis, 101 Fla. 624, 135 Sou. 147.

There are numerous cases to the effect that property may be confiscated and destroyed under the police power of the State, without violating the due process clauses of the State and Federal Constitutions. An important case on this subject is Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, where it is said:

" 'Acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though these consequences may impair its use,' do not constitute a taking within the meaning of the constitutional provision, or entitle the owner of such property to compensation from the State or its agents, or give him any right of action."

The Mugler case, *supra,* is cited and quoted with approval in Pompano Horse Club v. State, 93 Fla. 415, 111 Sou. 801, 52 A. L. R. 51. See also State v. Jackson, 152 La. 656, 94 Sou. 150.

In speaking about the police power of a municipality, this Court, in Maxwell v. City of Miami, 87 Fla. 107, 100 Sou. 147, 33 A. L. R. 682, said:

"Any exertion of municipal authority or of the police

power is subject to the provisions of organic law that are designed to conserve private rights. In the exercise of the police power, property and individual rights may be interfered with, or injured, or impaired, only in the manner and to the extent that are reasonably necessary to conserve the public good. An unreasonable or unnecessary exertion of municipal authority or of the police power in the manner or extent in which private personal or property rights are curtailed or impaired, violates organic law, in that it deprives persons of liberty and property without authority or due process of law."

There are also numerous cases which hold that the protection of the citrus fruit industry of this State by guarding it against destruction or serious injury by natural pests is an activity of the government resting for its authority upon the public interest affected by the success or failure of such industry and is within the police power of the State. Johnson v. State, 99 Fla. 1311, 128 Sou. 853; Maxcy v. Mayo, 103 Fla. 552, 139 Sou. 121; Kilgore v. Mayo, 54 F. (2d) 132; Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835.

Sections 262 and 263 of 11 Am. Jur., pages 998 and 999, deal with the effect of the Due Process and Equal Protection Clauses, relative to delegation of power to administrative agencies.

In State ex rel. Wolyn v. Apalachicola Northern R. Co., 81 Fla. 383, 87 Sou. 909, it was said:

"This Court has held that orders of the Railroad Commission fixing rates or making rules or regulations 'without obtaining or considering any substantial and pertinent evidence where investigation, inquiry and evidence are necessary as a basis for the action taken, the proceeding is not had in due course of law.' State ex rel. R. R. Com. v. F.

E. C. Ry. Co., 64 Fla. 112, 59 So. 385; State *ex rel* R. R. Com. v. F. E. C. Ry. Co., 69 Fla. 165, 67 So. 906. And in many cases it has beeen held that where it appears from admissions of the pleadings that *orders* or *regulations* made by them are not *authorized by law,* such orders or *regulations will not be enforced by the courts.* State *ex rel.* R. R. Com. v. Southern Telephone Co., 65 Fla. 270, 61 Sou. 506; State *ex rel.* R. R. Com. v. F. E. C. Ry. Co., *supra.* See also Interstate Commerce Commission v. Union Pacific R. Co., 222 U. S. 541, 32 Sup. Ct. 108, 56 L. Ed. 308; Interstate Commerce Commission v. Louisville & N. R. Co., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431. (Emphasis supplied.)

In Richter v. State, 16 Wyo. 437, 95 Pac. 51, the statute provided that:

" 'Any Inspector, either Federal or State, shall have authority to inspect and quarantine and treat sheep affected with contagious infectious diseases, or suspected of being so affected, or that have beeen so exposed to any such disease, * * *.' "

The Court in upholding the constitutionality of the statute, said:

"A conferred power of this nature is not inhibited by the Constitution because it is the method and practically the only method by which the State can enforce its police regulations. The law is essentially of that nature, and the protection sought and the object to be obtained must be by a summary method, and the State must act and act quickly through its agents who are clothed with certain powers in the performance of the duty. The power cannot be used arbitrarily nor oppressively, *but only in such cases and in the manner prescribed by the statute,* which, being penal in its nature, must be strictly construed." (Emphasis supplied.)

The North Carolina Court in case of State v. Southern R. Co., (1906), 141 N. C. 846, 54 S. E. 294, has said:

"The crime is fixed and declared by the Legislature as expressed in the Act. The Commissioner and Board are only given power to establish the conditions and certain administrative regulations under and upon which the statute is made to apply."

. Florida cases on this point are: State v. Atlantic Coast Line Ry. Co., 56 Fla. 617, 47 So. 969, 32 L. R. A. (NS) .639; Bailey v. Van Pelt, 78 Fla. 337, 82 Sou. 789; State v. Fowler, 94 Fla. 752, 114 Sou. 435; Pridgen v. Sweat, 125 Fla. 598, 170 So. 653.

And in *Ex Parte* Lewis, 101 Fla. 624, 135 So. 147, it was said:

"The Legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion in applying the law; but it may enact a law complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials *within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose.* The true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be *exercised under, and in pursuance of law.* The first cannot be done; to the latter no valid objection can be made." (Emphasis supplied.)

The bill of complaint showed that private property was about to be destroyed without due process of law, in fact without authority of law, and without meeting the terms specifically provided in the statutes, *supra.* The relief by injunction was the only relief which the complainant could

invoke. If the allegations of its bill of complaint are sustained by proof, it is entitled to that relief.

The allegations of the bill show that the complainant has done no wrong; that he has attempted to ship fruit as nature produced it, with the aid of cultivation and husbandry not contaminated, influenced, or affected by in any manner applying arsenic, or any derivative thereof, to the fruit at any time, or to the trees upon which the fruit grew within more than a year prior to the gathering of the fruit.

For the reasons stated, the decree should be reversed and the cause remanded, with directions that further proceedings be had not inconsistent with the views herein expressed.

BROWN, J., concurs.